**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:   MICHAEL ANDREW SOFTCHECK
And LINDA MAE SOFTCHECK,

                                     Chapter 7
                                     Case No. 08-23844 (RTL)

      Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
DENNIS J. KURC,

                                     Adversary Proceeding
        Plaintiff,         Case No. 08-2602 (RTL)
   v.

MICHAEL SOFTCHECK,

        Defendant/Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## OPINION

**APPEARANCES:**

**Fox and Melofchik, LLC**
**Gary E. Fox, Esq.**
**Attorneys for Plaintiff**

**Stanziale & Stanziale, P.C.**
**Benjamin A. Stanziale, Jr.,**
**Attorneys for Defendant/Debtor**

**RAYMOND T. LYONS, U.S.B.J.**

### INTRODUCTION

      Plaintiff requests a determination that his claim against the Debtor is nondischargeable

under 11 U.S.C. § 523(a)(2). He alleges that the Debtor defrauded him by failing to disclose the

financial and legal problems and the true name of their mutual business associate. Plaintiff also asserts that the Debtor misrepresented his own qualifications and failed to alert Plaintiff to the business associate's exaggerations.

The court concludes that the Debtor's failure to disclose to Plaintiff that their business associate had financial problems with the Internal Revenue Service ("IRS") was not done intentionally. The Debtor was unaware that their business associate had been accused by the Securities and Exchange Commission ("SEC") of defrauding investors until well after Plaintiff had made all of his investments; therefore, Plaintiff's losses were not caused by the Debtor's alleged failure to disclose that fact. The business associate began using his middle name at the request of his new wife. Failure of the Debtor to inform Plaintiff that the business associate had previously been known by his first name was not a misrepresentation. Plaintiff did not rely on the Debtor's qualifications and there was no proof that the business associate's qualifications were exaggerated. Thus, Plaintiff has failed to prove that his debt was procured by fraud.

## JURISDICTION

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) to determine the dischargeability of a particular debt.

## FINDINGS OF FACT AND PROCEDURAL HISTORY

Plaintiff, Dennis Kurc, enjoyed success in the warehouse business for many years. He retired in 2003 and subsequently sought to employ his talents and capital in the real estate

business. He answered an advertisement in the December 10, 2005 edition of the Asbury Park Press that read:

> EARN HIGH RETURN ON YOUR $ $
> Short term real estate in Mon/Middlesex
> Join Mike (phone number)

Plaintiff called the phone number and spoke with Michael Softcheck, the Debtor. They arranged to meet at a restaurant. At the meeting, Plaintiff and the Debtor were joined by the Debtor's business associate who introduced himself as Doug Puff. During the long meeting, Puff did most of the talking. He touted his thirty years of experience in buying, rehabilitating and reselling residential real estate. The Debtor spoke little, but said he had purchased rehabilitated houses, then held them for rent to tenants. The Debtor had formed a construction company, Rosa Linda Homes, that was managed by Puff and had done the rehabilitation work on properties. Puff explained that they were looking for investors in their business.

Plaintiff rejected the notion of becoming an investor. He wanted to be an owner of real estate so he could maintain control. However, he wanted to take advantage of Puff's experience in rehabilitating residential real estate.

After the meeting, Puff took Plaintiff on a tour of properties in New Jersey that Puff was working on. They ended up at a real estate office where the staff, including Puff's wife and brother, seemed to treat him as the boss. Plaintiff ran an internet search on Doug Puff and the Debtor but found nothing.

In January 2006, Plaintiff wrote a letter to Puff outlining his proposal for a joint venture. Addressing Puff, Plaintiff wrote:

> I am impressed with your talents and expertise . . . .
> I feel that you have the expertise, know-how and the

3

> drive of making things "happen". . . . The previous evening with both you and Mike, that it was very clear to me that you were and are the dominate [sic] player and when the % pie was offered to a 3-way split . . . and when it came to Mike . . . he had from my point of view nothing to bring to the table. . . . I would like to treat this as a partnership between you guy's [sic] & me as a 55/45 split – your portion being the higher. What and how you split with Mike would be your business.

Plaintiff proposed that he would provide financing for the purchase and costs of rehabilitating a property. To maintain control, he would take title to the real estate and reimburse Rosa Linda Homes for labor and materials. The improved property would be quickly sold and any profit, after Plaintiff recovered all his costs, would be split as proposed. Plaintiff's proposal was accepted. Before investing in any properties, Plaintiff consulted his own attorney.

Puff quickly located a number of distressed properties for Plaintiff to purchase. Between January 2006 and June 2006, Plaintiff acquired four properties presented by Puff. He took title to three properties in his name alone and the fourth was titled in a limited liability company. The total acquisition cost was approximately $1.5 million, plus Plaintiff paid for labor and materials to fix up the properties. All of the sellers were unrelated third parties and all construction expenses were verified by Plaintiff. He is certain that all of his investments went into the properties and not into the pockets of Puff or the Debtor.

In May 2006, Plaintiff became concerned about the pace of rehabilitation work and resale of the properties. He had anticipated that the two less expensive houses would have been rehabilitated and resold in a few weeks. By this time, several months had passed and the work was not yet complete nor the houses sold. Furthermore, construction costs exceeded estimates.

A third property was not only more expensive but more complicated. The parties

4

contemplated demolishing the structure, subdividing the property into four lots and either selling the lots or building new homes. It turned out that the property could not be subdivided into four lots without the cooperation of a neighbor that was not forthcoming. Plaintiff ended up rehabilitating the residence and subdividing one additional lot.

The fourth property had been under contract since February but closing was delayed for months because certain approvals had yet to be obtained. Plaintiff was concerned that he had already invested over $136,000 in this fourth property but still did not have title. This fourth property had a different wrinkle that later caused Plaintiff consternation. The contract of sale named both Plaintiff and the Debtor as buyers – a fact that Plaintiff overlooked when he signed the contract. When closing was finally scheduled in June 2006, Puff recommended that title be placed in a limited liability company, rather than Plaintiff's name alone, because there were tenants in the property and an LLC would provide a layer of insulation from liability. Plaintiff acquiesced. Again, he missed the fact that the Debtor was named a 50% member of the LLC.

By August 2006, Plaintiff's patience was exhausted and his anxiety increased. None of the projects had been completed or sold. He became more determined to extricate himself from the joint venture. In the ensuing months, various proposals were floated to have Plaintiff sell one or more properties to the Debtor. No agreement was ever consummated. In December 2006, Plaintiff demanded a dissolution of the joint venture. Since he controlled title to all four properties (so he thought), he announced that he would unilaterally undertake to sell them.

When Plaintiff listed the fourth property that was titled in an LLC, Puff drafted a letter to the broker, signed by the Debtor, claiming that, as a 50% owner of the LLC, the Debtor's consent was needed to sell the property. Upon learning of this letter, Plaintiff became enraged.

His protection from the inception of the joint venture was control of title to the properties. When that was cast into doubt on the fourth property, the relationship among Plaintiff, the Debtor and Puff became adversarial.

One day towards the end of 2006, while Plaintiff was sitting with Puff and his wife in an office, a foreman came in and called Puff by the name Wayne. Plaintiff, who had always known Puff by the first name Doug, asked why the man had called him Wayne. Puff and his wife explained that she had a previous boyfriend named Wayne and had insisted that Puff go by his middle name, Doug, after their marriage. Subsequently, in 2007, Plaintiff ran an internet search on Wayne Puff and discovered that he was the target of an SEC civil action for allegedly defrauding investors of millions of dollars in connection with a company called New Jersey Affordable Homes.

Plaintiff sued Puff, the Debtor, Rosa Linda Homes and others in state court for common law fraud, consumer fraud, and for dissolution of the LLC that owned the fourth property. The Debtor filed bankruptcy on July 24, 2008, that automatically stayed the state court action against him. A final judgment by default was entered by the state court on October 29, 2008, against Puff and Rosa Linda Homes for damages of $582,199.37.

*Debtor's Business With Puff*

Before meeting with Plaintiff in December 2005, the Debtor had his own dealings with Puff. The Debtor's occupation was a beer truck driver for a large brewery. In 2003, the Debtor became interested in investing in residential real estate. He purchased several rehabilitated one, two and three-family houses from Puff's company, New Jersey Affordable Homes, and rented them out to tenants. Later, he sought to become involved in the renovation aspect of the

business and approached Puff.  They agreed to work together and the Debtor formed a company, Rosa Linda Homes, to perform rehabilitation.  The Debtor owned the corporation and Puff was the manager.

When the Debtor first met Puff he went by the first name Wayne.  At that time, Puff was not married.  After his marriage, Puff asked the Debtor to call him by his middle name, Doug, because his wife had a previous boyfriend named Wayne and she preferred that Puff not use that name.  In fact she once reproached the Debtor for calling Puff "Wayne" in her presence.

The Debtor learned from Puff that he had financial problems with the IRS.  At the time the Debtor and Puff met Plaintiff in January 2006 that was the extent of the Debtor's knowledge of Puff's financial and legal problems.  The Debtor did not consider Puff's IRS problems to be serious and never thought it necessary to disclose this information to Plaintiff.

At trial, the Debtor testified that when he first met Plaintiff in January 2006, he was not aware that Puff had been accused by the SEC of defrauding investors.  He was certain that he did not know of the fraud allegations until Puff was arrested on criminal fraud charges sometime in June 2008.  However, his testimony at a pretrial deposition in this matter is inconsistent with his trial testimony.  At a deposition conducted four months before trial the Debtor testified:

> Q. Okay.  Now, so is it your testimony that you had no idea that Mr. Puff had these problems when you were speaking to Dennis in December of '05?
> A. No.
> Q. That's your testimony?
> A. Yes, I - -
> Q. When did you find out about those problems?
> A. Probably about - - I don't know.  His big problems were - -
> Q. Not his big problems.  I want to know about when did you ever find out about any problem that he might have?  I know you said the I.R.S.

7

> A. The I.R.S. he told me about. That was - - you know, that was about it. You know, then I find out that he was involved with - - you know, that - - the housing scam.
> Q. Well, you know he was involved with New Jersey Affordable?
> A. Correct.
> Q. When did you find out that he had an issue with an allegation that he was defrauding investors?
> A. Probably, I don't know, late 2005, something like that - -
> Q. And - -
> A. - - in 2005.
> Q. Okay. And when you found out about that in late 2005 - -
> A. Mm-hmm.
> Q. - - was that a surprise to you?
> A. Yes.

Obviously, if the Debtor knew about Puff defrauding investors in 2005 that was before he first met the Plaintiff and well before Puff's arrest in June 2008. The court concludes that the Debtor's guess at 2005 during his deposition was a mistake and his trial testimony was correct.

Another fact that raises questions about the accuracy of the Debtor's testimony is Plaintiff's recollection that after he ran an internet search on Wayne Puff in early 2007 and first learned of the civil fraud allegations, Plaintiff called the Debtor and complained that the Debtor had not warned him of Puff's problems. Plaintiff recalls the Debtor minimizing Puff's problems by stating, "He'll never serve a day in jail." The Debtor recalls the conversation and Plaintiff's remonstration, but does not recall any specifics of the allegations against Puff having been mentioned. After considering the demeanor of the Debtor and his overall testimony, the court concludes that the Debtor's trial testimony was truthful. Most important, at the crucial time before Plaintiff bought the properties, the Debtor was not fully aware of Puff's defalcations. His knowledge at that time was limited to Puff having IRS problems that Debtor did not consider serious. It may be that the Debtor had learned something of the fraud allegations against Puff by the time of their conversation in 2007 but that was well after Plaintiff had invested in the

properties between January and June 2006.

*Bankruptcy*

The Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code on July 24, 2008. Besides his residence, the Debtor listed several other pieces of real property on his Schedule A. The trustee abandoned most of this real estate as having no value in excess of mortgages. The Debtor has lost all of his investment real estate to foreclosure and expects to lose his home because he has not made a mortgage payment. The Debtor attributes his financial collapse to his dalliance in the real estate business with Mr. Puff coincidently with the downturn in the general economy and depreciation in the local real estate market.

In bankruptcy court, Plaintiff seeks a determination that his claim against the Debtor is nondischargeable on account of fraud under 11 U.S.C. § 523(a)(2)(A). Specifically, he claims he was defrauded when the Debtor failed to inform him that: (1) Doug Puff was also knows as Wayne Puff, and (2) Mr. Puff was accused by the SEC of defrauding investors and (3) Mr. Puff had financial problems with the IRS. Also, Plaintiff says the Debtor defrauded him by misrepresenting his experience and expertise in the real estate business and failing to alert Plaintiff that Puff exaggerated his own qualifications.

## **DISCUSSION**

"The overriding purpose of the Bankruptcy Code is to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start." *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1113 (3d Cir. 1995). Accordingly, exceptions to discharge are to be narrowly construed. A countervailing policy is that debts incurred through fraud should not be discharged. The discharge is reserved for the "honest but unfortunate debtor." *Grogan v.*

*Garner*, 498 U.S. 279, 286-87 (1991). "Where a debtor has committed fraud under the code, he is not entitled to the benefit of a policy of liberal construction against creditors." *Cohen v. De La Cruz (In re Cohen)*, 106 F.3d 52, 59 (3d Cir. 1997), *aff'd*, 523 U.S. 213 (1998). This countervailing policy is codified in Section 523(a)(2)(A) of the Bankruptcy Code which provides:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by false pretenses, a false representation, or actual fraud . . . .

11 U.S.C. § 523(a)(2)(A) (2009).

This fraud exception to discharge has been part of the bankruptcy law of the United States since 1898. *Cohen,* 523 U.S. at 221; *Field v. Mans*, 516 U.S. 59, 64-66 (1995). Since Congress has not provided a separate definition, fraud has the same meaning in the Bankruptcy Code as in the common law of torts. *Field*, 516 U.S. at 69-70.

> The operative terms in § 523(a)(2)(A), on the other hand, "false pretenses, a false representation, or actual fraud," carry the acquired meaning of terms of art. They are common-law terms, and, as we will shortly see in the case of "actual fraud," which concerns us here, they imply elements that the common law has defined them to include. . . .
>
> "It is . . . well established that '[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'" . . .
>
> [W]e will look to the concept of "actual fraud" as it

> was understood in 1978 when that language was added to § 523(a)(2)(A). Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the Act.

*Id.* (alteration in original) (citations omitted).

Following the Court's guidance, one should look to the Restatement for the meaning of fraud. The Restatement (Second) of Torts, Section 525, sets forth the law regarding liability for fraudulent misrepresentation.

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

As the Supreme Court pointed out, "courts that have previously construed this statute, routinely requir[e] intent, reliance, and materiality before applying § 523(a)(2)(A)." *Field*, 516 U.S. at 68. Thus, for a debt to be nondischargeable under Section 523(a)(2)(A) the creditor must prove that:

(1) the debtor represented a fact, opinion, intention or law;

(2) the representation was false;

(3) the representation was material;

(4) the debtor obtained money, property or services through the misrepresentation;

(5) the debtor knew at the time that the statement was false (or was made with reckless disregard for its truth);

(6) the debtor intended the creditor to rely on the statement;

(7) the creditor actually relied on the statement;

11

    (8) the reliance was justified;

    (9) the creditor sustained damage; and

  (10) the damages were the proximate result of the false representation.

*De La Cruz v. Cohen (In re Cohen)*, 191 B.R. 599, 604 (D.N.J. 1996), *aff'd sub nom.,* 106 F.3d 52 (3d Cir. 1997), *aff'd* 523 U.S. 213 (1998); *AT&T Universal Card Servs. Corp. v. Wong (In re Wong)*, 207 B.R. 822, 826 (Bankr. E.D. Pa. 1997).  The plaintiff bears the burden of proving the objection to discharge.  FED. R. BANKR. P. 4005.  Each element of the objection must be proved by a preponderance of the evidence.  *Grogan*, 498 U.S. at 287-88; *Starr v. Reynolds (In re Reynolds)*, 197 B.R. 204, 205 (Bankr. D.N.J. 1996).

    The last alleged fraud, that the Debtor misrepresented his experience and expertise in the real estate business, can be easily overcome.  Plaintiff's own evidence shows that he did not rely on the Debtor's experience or expertise in entering into the joint venture.  As he wrote in his letter to Puff, "When it came to Mike . . . he had from my point of view nothing to bring to the table."  By contrast, Plaintiff wrote to Puff, "I am impressed by your talents and expertise. . . .  I feel that you have the expertise, know-how and the drive of making things 'happen'."  Plaintiff entered the joint venture because he was impressed with Puff.  He was not impressed with the Debtor.  Furthermore, there was no evidence that the Debtor misrepresented his background in real estate; but if he had, Plaintiff did not rely on it.

    Plaintiff also alleges that Puff overstated his thirty years of experience in the real estate business and his capabilities in rehabilitating residences.  Plaintiff claims that the Debtor knew that Puff was exaggerating his qualifications and should have warned Plaintiff.  However, no proof was offered that Puff misrepresented his experience or capabilities.  Plaintiff asks the court

to infer from the problems encountered with his properties, that Puff must not have had the qualifications that he touted. For example, Puff told Plaintiff that homes could be rehabilitated in a few weeks, however, Plaintiff's properties took longer. Plaintiff suggests that Puff must have misrepresented the time it would take to rehabilitate a home. The court is unwilling to make that inference.

Regarding Puff's first name of Wayne, the Debtor corroborated Plaintiff's testimony that Puff began using his middle name "Doug" at his wife's request following their marriage. The Debtor testified that when he first met Puff in 2006, Puff introduced himself as Wayne. Puff was not married at that time. After his marriage, Puff asked the Debtor to call him Doug at his wife's request. The Debtor testified that he once called Puff "Wayne" in his wife's presence and she rebuked him.

Puff's introduction of himself to Plaintiff as Doug in January 2006 was not a misrepresentation. That was a legitimate name adopted by him at his wife's request. The Debtor did not conceal Puff's other name of Wayne to hide anything from Plaintiff. Puff's use of the name Doug and the Debtor's failure to inform Plaintiff that Puff was also known as Wayne did not constitute fraud.

That leaves the remaining assertion by Plaintiff that the Debtor failed to inform him in December 2005, that Puff was being pursued by the SEC for defrauding investors. The Debtor testified that he did not learn that Puff was accused of defrauding investors until Puff was arrested in June 2008. The court has concluded above that the Debtor was not fully aware of Puff's legal problems until Puff's arrest in June 2008. Prior to that, the Debtor knew that Puff had IRS problems but did not consider them serious. The Debtor did not intend to mislead

13

Plaintiff by failing to disclose Puff's problems with the IRS.

It is notable that there was nothing fraudulent about the purchase of the four properties or the rehabilitation of them. Each purchase appears to have been an arms-length contract with an independent third party. None of the proceeds of sale made their way to the Debtor, either directly or indirectly, nor to Mr. Puff. Furthermore, all of the expenses for rehabilitation were verified by Plaintiff before he paid for them. Neither Puff nor the Debtor profited from those expenditures. The only hope for the Debtor or Puff to benefit from these transactions would be if a property could be sold at a profit. There was no economic incentive to defraud Plaintiff since only profitable deals would yield money to the Debtor and Puff.

To date, two properties have been sold at a loss in each case. The estimated value of the two remaining properties is less than the amount Plaintiff has invested. No profits are anticipated from either property. Thus, the Debtor has not and will not receive any money from the transactions. The losses suffered by Plaintiff are attributable to the downturn in the real estate market and perhaps excessive costs of acquisitions or improvements, not fraud in the transaction.

Plaintiff's claim is that, had he known all the facts about Mr. Puff, he never would have done business with him; consequently, he would not have suffered any losses. Plaintiff's ignorance about Puff cannot be blamed on the Debtor. Both Plaintiff and the Debtor were charmed by Puff, who they both describe as an extremely persuasive person, and both have suffered losses through real estate investments. In fact, the Debtor's losses are so severe he ended up in bankruptcy, has lost all of his investments to foreclosure, and expects to lose his house. Plaintiff's losses, while substantial, have not impacted him as severely.

## **CONCLUSION**

Plaintiff has failed to prove by a preponderance of the evidence that his claim against the Debtor was procured by fraud.  Judgment will be granted to the Debtor finding no cause to hold Plaintiff's debt nondischargeable.

Dated: December 4, 2009                                                **/S/Raymond T. Lyons**
United States Bankruptcy Judge